## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

-------------------------------------------------------x

UNITED STATES OF AMERICA      :     3:12- Cr- 235- MOC

     : 

        v.                :     Filed:

     : 

**PHILLIP DENNIS MURPHY,**      : 

     :     Violations:     18 U.S.C. § 371

           Defendant.      :                      18 U.S.C. § 1343

-------------------------------------------------------x

## INDICTMENT

The Grand Jury charges:

### COUNT ONE - CONSPIRACY
#### (18 U.S.C. § 371)

1.     PHILLIP DENNIS MURPHY ("MURPHY") is hereby indicted and made a defendant on the charge stated below.

### RELEVANT PARTIES AND ENTITIES

2.     At all times relevant to this Indictment, Financial Institution A was a financial institution that was a national banking association, chartered and examined by the Comptroller of the Currency, and whose deposits are insured by the Federal Deposit Insurance Corporation. Financial Institution A was headquartered in Charlotte, North Carolina, with locations in New York, New York, Chicago, Illinois, and various other

1

locations throughout the United States. Defendant MURPHY worked in Financial Institution A's Charlotte, North Carolina office. Financial Institution A marketed financial products and services, including services as a provider of investment agreements and other municipal finance contracts to various municipalities located throughout the United States.

3.      At all times relevant to this Indictment, Rubin/Chambers, Dunhill Insurance Services, Inc. ("CDR") was a corporation existing under the laws of the State of California with its principal place of business in Beverly Hills, California. CDR did business as Chambers, Dunhill & Rubin Co. and as CDR Financial Products, Inc. CDR marketed financial products and services, including services as a broker or advisor to various municipalities throughout the United States.

4.      From approximately June 1998 until approximately September 2002, PHILLIP DENNIS MURPHY, the defendant, a resident of Charlotte, North Carolina, worked in Financial Institution A's municipal derivatives group as Managing Director of Municipal Derivatives Products and as a marketer of investment agreements and other municipal finance contracts. As Managing Director of Municipal Derivatives Products, MURPHY managed and supervised the day-to-day activities and personnel of the municipal derivatives group. Among the personnel he managed were Douglas Lee Campbell ("Campbell") and Marketer A. MURPHY's compensation, including bonus, was based on, among other things, the amount of revenues generated by Financial

2

Institution A's municipal derivatives group.

5.    From approximately June 1998 through approximately August 2002, Campbell, a co-conspirator not named as a defendant herein, worked in Financial Institution A's municipal derivatives group, as a Senior Vice President and as a marketer of investment agreements and other municipal finance contracts. From approximately June 1998 through September 2001, Campbell worked at Financial Institution A's offices located in Charlotte, North Carolina and from approximately September 2001 through approximately August 2002, at Financial Institution A's offices located in New York, New York. Campbell was supervised by defendant MURPHY until Financial Institution A terminated Campbell's employment in approximately August 2002.

6.    From approximately March 1999 until approximately July 2004, Marketer A, a co-conspirator not named as a defendant herein, worked at Financial Institution A's municipal derivatives group as a Senior Vice President and as a marketer of investment agreements and other municipal finance products. Marketer A worked in Financial Institution A's Charlotte, North Carolina, office and was supervised by defendant MURPHY until defendant MURPHY separated from Financial Institution A's employ in approximately September 2002.

7.    Whenever in this Count reference is made to any act, deed, or transaction of any corporation, such allegation shall be deemed to mean that the corporation engaged in such act, deed or transaction by or through its officers, directors, agents, employees, or

other representatives while they were actively engaged in the management, direction, control, or transaction of its business affairs.

8.      Various other persons and entities, not made defendants herein, including Financial Institution A, CDR, Campbell and Marketer A, participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance thereof.

9.      The conduct alleged in this Count caused Financial Institution A and at least two other financial institutions to be susceptible to substantial risk of loss and to suffer actual loss. In particular, Financial Institution A agreed to pay federal and state agencies over $137 million in settlements as compensation for the losses incurred by those agencies and victims as a result of the conduct alleged in this Count.

BACKGROUND

10.     At all times relevant to the Indictment, municipal bonds were issued by government entities, such as states, counties, and cities, or quasi-government entities, such as public authorities and school, utility or water districts to raise money for operating funds or for specific projects, such as the construction of public facilities, and to refinance outstanding municipal debt. In some instances, the entity that issued the bonds turned the money over to a not-for-profit entity, such as a school or hospital, or an entity that spent the money for a specific public purpose, such as the construction of low-cost housing, waste treatment facilities or educational facilities. Both the entities that issued municipal bonds and the entities that received and spent the money are, unless otherwise stated,

4

collectively referred to herein as "issuers," "municipal issuers," or "municipalities."

11.　　The money an issuer raised from a municipal bond offering ("bond proceeds") was typically spent over a period of time rather than in one lump sum immediately. The municipal issuer frequently invested some or all of bond proceeds in an investment product (sometimes referred to as an "investment agreement") that was designed for its specific needs.

12.　　Major financial institutions, including banks, insurance companies, and financial services companies (collectively "providers"), sold investment agreements through their employees or agents. Financial Institution A was such a provider, and sold investment agreements and other municipal finance contracts through its employees or agents, including PHILLIP DENNIS MURPHY, the defendant.

13.　　Issuers usually selected providers of investment agreements through *bona fide* competitive bidding procedures that were designed to comply with federal tax law and United States Department of the Treasury regulations relating to the tax-exempt status of municipal bonds. Compliance with these regulations was monitored by the Internal Revenue Service ("IRS"), which was entitled to receive a portion of the earnings from a municipality's investment agreement under certain circumstances. Among other things, each provider that submitted a bid typically certified that the requirements of specific Treasury regulations had been followed, including that the provider did not consult with any other potential provider about its bid, that the bid was determined without regard to

5

any other formal or informal agreement that the potential provider had with the issuer or any other person, and that all providers had an equal opportunity to bid, commonly referred to as the no "last looks" provision.

14.     Issuers often hired third parties ("brokers") to act as their agents in conducting a *bona fide* competitive bidding process and complying with the relevant Treasury regulations. CDR was such a broker. The broker's fee for conducting a *bona fide* competitive bidding process was generally paid by the winning provider, which took account of the cost of the broker's fee when calculating its bid and generally disclosed the fee to the issuer.

15.     A provider typically became aware of an upcoming bid from a broker, although in some instances the broker became aware of a possible investment agreement from a provider. In some cases, the broker decided which providers were solicited to bid without consulting with the issuer or any of the other professional representatives advising the issuer. A provider typically received a bid package (specifications and bid forms) from the broker, usually via e-mail. A typical bid package contained, among other things, the bid specifications, which detailed the type of investment agreement or other municipal finance contract for which bids were being solicited, the date and time of the bid, and under what circumstances the bid took place. A typical package also required each provider that submitted a bid to make certain representations, including that a *bona fide* bidding process was conducted and that the bidding process conformed to the relevant

6

Treasury regulations. A provider usually submitted its bid to the broker orally over the telephone at a time identified in the bid specifications, and then sent a conforming copy of the bid via facsimile to the broker.

16. After reviewing the bids to ensure conformity with the specifications, the broker informed the issuer of the outcome of the bid, including the identity of the winning, qualified bidder and, if appropriate, any conditions that deviated from the specifications. Brokers were often required by issuers to provide a written certification that the bidding procedures complied with the relevant Treasury regulations.

17. Depending on the structure of the bid, providers at times were asked to quote only the interest rate to be paid on funds on deposit for the duration of the agreement or they might have been asked to submit a bid in the form of a dollar amount or date.

18. Many brokers that conducted *bona fide* competitive bidding investment agreements subject to the Treasury regulations were also hired by municipalities and other quasi-government entities to conduct *bona fide* competitive bidding in connection with the award of other contracts involving public funds, even though those contracts were not subject to the Treasury regulations. These contracts (collectively, "other municipal finance contracts") included, but were not limited to, investment agreements for taxable municipal bonds; investment agreements for funds borrowed by entities in which the federal government is a participant; and derivative contracts, which were contracts

7

between a municipal issuer and a financial institution that were designed to manage or transfer some or all of the interest rate risk associated with a municipal bond issue. They did not include underwriting contracts.

## DESCRIPTION OF THE OFFENSE

19.    From at least as early as August 1998 until at least November 2006, the exact dates being unknown to the Grand Jury, in the Western District of North Carolina and elsewhere, PHILLIP DENNIS MURPHY, the defendant and his co-conspirators, including Financial Institution A, CDR, Campbell and Marketer A, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States of America, to wit, to violate Title 18, United States Code, Section 1343, and to defraud the United States of America and an agency thereof, to wit, the Internal Revenue Service ("IRS") of the United States Department of the Treasury, all in violation of Title 18, United States Code, Section 371.

20.    It was a part and an object of the conspiracy that PHILLIP DENNIS MURPHY, the defendant, and his co-conspirators, including Financial Institution A, CDR, Campbell and Marketer A, and others known and unknown, unlawfully, willfully, and knowingly would and did devise and intend to devise a scheme and artifice to defraud municipal issuers and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, which scheme to defraud affected a financial

8

institution, namely, a scheme to defraud municipal issuers by manipulating the bidding process for investment agreements and other municipal finance contracts by colluding with each other, and further to deprive the municipal issuers of the property right to control their assets by causing them to make economic decisions based on false and misleading information, and for the purposes of executing such scheme and artifice, and attempting to do so, would and did transmit and caused to be transmitted by means of wire, radio or television communication in interstate or foreign commerce any writings, signs, signals, pictures or sounds, in violation of Title 18, United States Code, Section 1343.

21.     It was a further part and object of the conspiracy that PHILLIP DENNIS MURPHY, the defendant, and his co-conspirators, including Financial Institution A, CDR, Campbell and Marketer A, and others known and unknown, would and did defraud the United States of America and the IRS by impeding, impairing, obstructing, and defeating the lawful government functions of the IRS in the ascertainment, computation, assessment, and collection of revenue due and owing from municipal issuers and in exercising its responsibilities to monitor compliance with Treasury regulations related to tax-exempt municipal bonds, in violation of Title 18, United States Code, Section 371.

<u>THE MANNER AND MEANS</u>

<u>BY WHICH THE CONSPIRACY WAS CARRIED OUT</u>

22.     For purposes of effectuating the aforesaid conspiracy, PHILLIP DENNIS

9

MURPHY, the defendant, and his co-conspirators, including Financial Institution A, CDR, Campbell, Marketer A and others known and unknown, did those things which they conspired to do, including among other things:

(a) Through the control and manipulation of the bidding process for investment agreements and other municipal finance contracts, MURPHY and his co-conspirators increased and attempted to increase the number and profitability of investment agreements and other municipal finance contracts awarded to Financial Institution A by the municipal issuers that used CDR as their broker;

(b) MURPHY and his co-conspirators designated in advance of the submission of bids brokered by CDR which co-conspirator provider among the co-conspirator providers would be the winning bidder for certain investment agreements and other municipal finance contracts;

(c) MURPHY and his co-conspirators encouraged municipal issuers to hire CDR to broker the investment agreements and other municipal finance contracts associated with municipal bond issues that Financial Institution A had underwritten or in which Financial Institution A otherwise had an interest;

(d) MURPHY and his co-conspirators discussed and agreed on the interest rates, amounts, or other conditions that Financial Institution A and other co-conspirator providers would bid for certain investment agreements and other municipal finance contracts;

10

(e)     MURPHY and his co-conspirators obtained information from CDR about the interest rates, amounts, dates or other conditions related to competing providers' bids, including in some instances, the exact interest rate, amount or other conditions of competing providers' bids;

(f)     MURPHY and his co-conspirators determined Financial Institution A's bid after obtaining information from CDR about the interest rates, amounts, and other conditions related to competing providers' bids;

(g)     With respect to investment agreements and other municipal finance contracts that MURPHY and his co-conspirators wanted Financial Institution A to win, MURPHY and his co-conspirators wrote bid specifications to include terms for investment agreements that favored Financial Institution A, selected other providers to bid that would and did submit intentionally losing bids, and, after receiving information from defendant MURPHY and his co-conspirators, including Campbell and Marketer A regarding the interest rates, amounts or other conditions that Financial Institution A intended to bid, told the other providers what interest rates, amounts or other conditions to bid. As a result, Financial Institution A increased its profits from those agreements and contracts by paying artificially determined and suppressed interest rates or amounts for their duration;

(h)     MURPHY and his co-conspirators submitted and caused to be submitted to CDR intentionally losing bids for certain investment agreements and other

11

municipal finance contracts. The intentionally losing bids made it appear both to the municipalities, and, on occasion, to the IRS, that CDR had solicited potential providers that would and did compete for those agreements and contracts, when, in fact, it had not;

(i)     MURPHY and his co-conspirators agreed to pay and caused Financial Institution A to pay CDR kickbacks, in the form of fees on hedge transactions that were unearned and inflated relative to services performed, in exchange for CDR's assistance in controlling and manipulating the competitive bidding process for certain investment agreements and other municipal finance contracts;

(j)     MURPHY and his co-conspirators misrepresented to municipal issuers or their bond counsel that the bidding process was *bona fide* and in compliance with Treasury regulations or was otherwise competitive;

(k)     MURPHY and his co-conspirators certified, caused to be certified, and forwarded written, false certifications to the municipal issuers or their bond counsel that the bidding process for certain investment agreements and other municipal finance contracts was *bona fide* and in compliance with the Treasury regulations, including that the provider did not consult with any other potential provider about its bid, that the bid was determined without regard to any other formal or informal agreement that the provider had with the issuer or any other person and that all providers had an equal opportunity to bid, commonly referred to as the no "last looks" provision.

(l)     MURPHY and his co-conspirators caused municipal issuers to award

12

investment agreements and other municipal finance contracts to Financial Institution A, which agreements and contracts the municipal issuers would not have awarded to Financial Institution A if they had true and accurate information regarding the bidding process;

(m)    MURPHY and his co-conspirators paid municipalities or caused municipalities to be paid artificially determined and suppressed interest rates or amounts for the duration of certain investment agreements and other municipal finance contracts, thereby increasing the profitability of those agreements or contracts for the winning co-conspirator provider for their duration;

(n)    MURPHY and his co-conspirators caused Financial Institution A to perform investment agreements and other municipal finance contracts at artificially determined and suppressed interest rates, amounts, or other conditions that deprived, and will continue to deprive, municipal issuers of money and property;

(o)    MURPHY and his co-conspirators caused municipal issuers not to file the required reports with the IRS or to file inaccurate reports with the IRS, or on occasion, to fail to give the IRS or the United States Treasury money to which it was entitled as a condition of the tax-exempt status of the underlying bonds that jeopardized the tax-exempt status of the underlying bonds; and

(p)    MURPHY and his co-conspirators received compensation and bonuses for the revenue derived through the foregoing illegal actions.

## OVERT ACTS

23.    In furtherance of the conspiracy and to effect the illegal objects thereof, PHILLIP DENNIS MURPHY, the defendant, and his co-conspirators, including Financial Institution A, CDR, Campbell, Marketer A and others known and unknown, committed the following overt acts, among others, in the Western District of North Carolina and elsewhere:

(a)    On numerous occasions, at or about the time the bids were due, MURPHY and his co-conspirators participated in interstate telephone calls to and from Charlotte, North Carolina, during which they obtained information from co-conspirators at CDR about the interest rates, amounts or conditions of other providers' bids.  MURPHY and his co-conspirators then used that information to determine Financial Institution A's bid.  As a result of this control and manipulation of the bidding process, Financial Institution A was awarded, has performed and continues to perform investment agreements and other municipal finance contracts at artificially determined and suppressed interest rates or amounts that deprived and will continue to deprive municipal issuers of money and property;

(b)    On numerous occasions, at or about the time the bids were due, MURPHY and his co-conspirators participated in interstate telephone calls to or from Charlotte, North Carolina, during which co-conspirators at CDR asked MURPHY and his co-conspirators to submit intentionally losing bids for investment agreements and other

14

municipal finance contracts and provided information about competing providers' interest rates, amounts, conditions or other information which MURPHY and his co-conspirators used to determine Financial Institution A's bids;

(c)     On numerous occasions, MURPHY and his co-conspirators participated in interstate telephone calls to or from Charlotte, North Carolina, during which they discussed and agreed upon which investment agreements and other municipal finance contracts would be won by Financial Institution A;

(d)     On numerous occasions, MURPHY and his co-conspirators participated in interstate telephone calls to or from Charlotte, North Carolina, during which they discussed, made or sought to make arrangements for CDR to receive kickbacks;

(e)     On numerous occasions, MURPHY and his co-conspirators misrepresented to municipal issuers or their bond counsel the circumstances under which investment agreements and other municipal finance contracts were bid;

(f)     On numerous occasions, MURPHY and his co-conspirators certified and forwarded written certifications to municipal issuers or their bond counsel stating that the bidding process for certain investment agreements or other municipal finance contracts was *bona fide* and in compliance with the Treasury regulations or was otherwise competitive when, in fact, it was not;

(g)     On numerous occasions, Financial Institution A performed

15

investment agreements and other municipal contracts and made payments or delivered securities via interstate wire transfer at artificially determined and suppressed interest rates or amount. Financial Institution A continues to perform some of these agreements and contracts;

(h)     With respect to an investment agreement for the Alameda Corridor Transportation Authority, MURPHY and his co-conspirators committed and caused to be committed the following overt acts, among others:

(1)     On or about June 19, 2000, a co-conspirator at CDR solicited an intentionally losing bid via interstate telephone calls from Beverly Hills, California to New York, New York, in order to ensure that Financial Institution A won the investment agreement; and

(2)     Beginning in approximately January 2003 and continuing until at least October 17, 2006, MURPHY and his co-conspirators made and caused to be made periodic deliveries of securities via wire transfer from Charlotte, North Carolina, to Cincinnati, Ohio, at interest rates or amounts that were artificially determined and suppressed;

(i)     With respect to an investment agreement for the J. David Gladstone Institutes, MURPHY and his co-conspirators committed and caused to be committed the following overt acts, among others:

(1)     On or about August 16, 2001, MURPHY sent an email to a

16

public finance banker employed by Financial Institution A advising her that a representative from CDR would contact her;

(2)     On or about October 23, 2001, the day of the bid, during an interstate telephone call between California and New York, a co-conspirator at CDR arranged for another provider to submit an intentionally losing bid for the investment agreement in order to ensure that Financial Institution A won the investment agreement;

(3)     In exchange for CDR's manipulation and control of the bidding process so that Financial Institution A won the investment agreement, MURPHY and his co-conspirators agreed to pay and did pay a kickback to CDR on an unrelated derivatives transaction;

(4)     On or about January 18, 2002, MURPHY and his co-conspirators caused Financial Institution A to pay, and Financial Institution A did pay, via interstate wire transfer from Charlotte, North Carolina, to Beverly Hills, California, a $70,000 kickback disguised as a fee in connection with an unrelated derivatives transaction; and

(5)     Beginning in approximately November 2001 and continuing at least until October 2, 2006, MURPHY and his co-conspirators made and caused to be made periodic delivery of securities via wire transfer from Charlotte, North Carolina, to Utica, New York, in connection with the investment agreement at interest rates or amounts that were artificially determined and suppressed.

17

(j)     With respect to an investment agreement for Santa Clara University, MURPHY and his co-conspirators committed or caused to be committed the following overt acts, among others:

(1)     On or about January 17, 2002, the day the bids were due, a co-conspirator at CDR solicited an intentionally losing bid from another provider via two interstate telephone calls from Beverly Hills, California to New York, New York, in order to ensure that Financial Institution A won the investment agreement;

(2)     On or about January 17, 2002, the day the bids were due, a co-conspirator at CDR solicited a pass on a bid from a provider via an interstate telephone call from Beverly Hills, California, to New York, New York, in order to ensure that Financial Institution A won the investment agreement.

(k)     With respect to an investment agreement for the Art Center College of Design, MURPHY and his co-conspirators committed or caused to be committed the following overt acts, among others:

(1)     On or about May 7, 2002, via a telephone call from Charlotte, North Carolina to New York, New York, MURPHY informed Campbell that MURPHY had given an indication of Financial Institution A's bid to a co-conspirator at CDR in order to ensure that Financial Institution A won the investment agreement; and

(2)     On or about May 7, 2002, a co-conspirator at CDR placed two telephone calls from Beverly Hills, California, to New York, New York for the purpose of

18

soliciting an intentionally losing bid from another provider in order to ensure that
Financial Institution A won the investment agreement.

(IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 371.)

## COUNT TWO - WIRE FRAUD
(18 U.S.C. § 1343)

The Grand Jury further charges:

24.　　PHILLIP DENNIS MURPHY ("MURPHY") is hereby indicted and made a
defendant on the charge stated below.

25.　　The allegations contained in paragraphs 2 through 7 and paragraphs 9
through 18 of this Indictment are repeated and re-alleged as if fully set forth herein.

## DESCRIPTION OF THE OFFENSE

26.　　From at least as early as August 1998 until at least November 2006, the
exact dates being unknown to the Grand Jury, in the Western District of North Carolina
and elsewhere, PHILLIP DENNIS MURPHY, the defendant, and other persons known
and unknown, unlawfully, willfully and knowingly, having devised and intending to
devise a scheme and artifice to defraud municipal issuers and to obtain money and
property from these municipal issuers by means of false and fraudulent pretenses,
representations, and promises, which scheme affected Financial Institution A and at least
two other financial institutions, namely, a scheme to defraud municipal issuers, by causing
municipal issuers to award investment agreements and other municipal finance contracts

19

at artificially determined or suppressed levels, and further to deprive municipal issuers of the property right to control their assets by causing them to make economic decisions based on false and misleading information, and for the purpose of executing such scheme and artifice, and attempting to do so, did transmit and cause to be transmitted by means of wire, radio or television communication in interstate commerce, writings, signs, signals, pictures, or sounds, in violation of Title 18, United States Code, Section 1343, including the following:

   (a) Among other things, in furtherance of this scheme and artifice to defraud and in connection with an investment agreement for the J. David Gladstones Institutes, Murphy caused Financial Institution A to wire $70,000 to CDR on or about January 18, 2002, via interstate wire transfer from Charlotte, North Carolina, to Beverly Hills, California, which was an undisclosed kickback disguised as a fee in connection with an unrelated derivative transaction.

   (b) Among other things, in furtherance of this scheme and artifice to defraud and in connection with the investment agreement for the J. David Gladstones Institutes, beginning in approximately November 2001 and continuing at least until October 2, 2006, Financial Institution A made periodic deliveries of securities via interstate wire transfer at interest rates or amounts that were artificially determined and suppressed.

  (IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1343.)

## COUNT THREE - CONSPIRACY TO MAKE FALSE ENTRIES IN BANK RECORDS
(18 U.S.C. § 371)

The Grand Jury further charges:

27.     PHILLIP DENNIS MURPHY ("MURPHY") is hereby indicted and made a defendant on the charge stated below.

28.     The allegations contained in paragraphs 2 through 7 and 9 through 18 of this Indictment are repeated and re-alleged as if fully set forth herein.

### THE RELEVANT PARTIES AND ENTITIES

29.     Brian Scott Zwerner, a co-conspirator not named as a defendant herein, was the Manager of the Derivatives Trading Desk at Financial Institution A from approximately July 1998 until approximately October 2002.  During that period, Zwerner worked at Financial Institution A's offices located in Chicago, Illinois.  Zwerner's duties included calculating profitability and hedging interest rate risk for investment agreements and other municipal finance contracts sold by MURPHY, or individuals under his supervision, including Marketer A and Marketer A-2.

30.     Various other persons, including include Zwerner, Marketer A and Marketer A-2, not made defendants herein, participated as co-conspirators in the offense charged herein and performed acts in furtherance thereof.

### BACKGROUND

21

internal reporting document called a "trade ticket" be created in connection with each investment agreement or other municipal finance contract sold by the Municipal Derivatives Group.

32.     Individuals in the marketing and trading groups completed trade tickets by hand at or near the time of the award of an investment agreement or other municipal finance contract to Financial Institution A.  Trade tickets recorded all basic facts and data relating to the trading activity for investment agreements or municipal finance contracts entered into by Financial Institution A.  In particular, the trade ticket recorded the "Trade NPV," otherwise known as the anticipated marketing profit on the trade.

33.     Certain information from trade tickets, including marketing profit, were entered into a computerized tracking and reporting database at Financial Institution A known as STARS.  Financial Institution A's officers reviewed the information in STARS on a regular basis and used this information to track the performance of the municipal derivatives group.

DESCRIPTION OF THE OFFENSE

34.     From at least as early as January 1999 until at least May 2002, the exact dates being unknown to the Grand Jury, in the Western District of North Carolina and elsewhere, PHILLIP DENNIS MURPHY, the defendant, and his co-conspirators, including Zwerner, Marketer A and Marketer A-2, and other persons known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and

22

agree together and with each other to commit offenses against the United States of America, to wit, to violate Title 18, United States Code, Section 1005, in violation of Title 18, United States Code, Section 371.

35.     It was a part and an object of the conspiracy that PHILLIP DENNIS MURPHY, the defendant and his co-conspirators, including Zwerner, Campbell and Marketer A, and other persons known and unknown, being officers, directors, agents and employees of a Financial Institution A, did make and cause to be made entries in the books, reports, and statements of such bank, for the purpose of deceiving and with the intent to deceive officers of such bank while knowing the entry or entries were false, in violation of Title 18, United States Code, Section 1005.

THE MANNER AND MEANS
BY WHICH THE CONSPIRACY WAS CARRIED OUT

36.     For the purposes of effectuating the aforesaid conspiracy, PHILLIP DENNIS MURPHY, the defendant, and his co-conspirators, including Zwerner, Marketer A and Marketer A-2, and other persons known and unknown, did those things which they conspired to do, including, among other things:

(a)     MURPHY and his co-conspirators agreed to falsify marketing profits on trade tickets for certain investment agreements or other municipal finance contracts;

(b)     MURPHY and his co-conspirators recorded the false marketing profits for certain investment agreements and other municipal finance contracts on a series of spreadsheets, referred to by the co-conspirators as the "kitty";

23

(c)     MURPHY and his co-conspirators used the money accumulated in the kitty and other funds to pay kickbacks, disguised as fees to brokers, including CDR, for purportedly brokering financial transactions between Financial Institution A and other entities.  In reality, these kickbacks were paid to brokers, including CDR, for controlling and manipulating the competitive bidding process to ensure that Financial Institution A won bids for investment agreements and other municipal finance contracts;

(d)     MURPHY and his co-conspirators also used the money accumulated in the kitty to overstate marketing profits on trade tickets for certain investment agreements and other contracts to make those agreements and contracts appear to Financial Institution A's officers to be more profitable than they actually were;

(e)     MURPHY and his co-conspirators caused the false marketing profits on trade tickets for certain investment agreements to be incorporated into STARS and other sales tracking and reporting databases at Financial Institution A; and

(f)     By falsifying the marketing profits on trade tickets, MURPHY and his co-conspirators deceived Financial Institution A's officers as to the actual performance of the municipal derivatives marketing desk.

<u>OVERT ACTS</u>

37.     In furtherance of the conspiracy and to effect the illegal object thereof, PHILLIP DENNIS MURPHY, the defendant, and his co-conspirators, including Zwerner, Campbell and Marketer A, and other persons known and unknown, committed the

24

following overt acts, among others, in the Western District of North Carolina and elsewhere:

(a)     On numerous occasions, MURPHY and his co-conspirators caused false marketing profit amounts from trade tickets to be entered into Financial Institution A's sales tracking and reporting databases, including STARS;

(b)     On numerous occasions, MURPHY and his co-conspirators falsified marketing profits on trade tickets related to investment agreements and other municipal finance contracts, including the following:

(1)     On or about August 3, 2000, MURPHY and his co-conspirators entered a false marketing profit of $500,000 for the Health and Education Facility Authority for Missouri;

(c)     On numerous occasions, in Charlotte, North Carolina, MURPHY received emails and an Excel spreadsheet from Zwerner on which Zwerner had tracked the transactions for which MURPHY and his co-conspirators had caused marketing profits related to investment agreements or other municipal finance contracts to be falsified;

(d)     On March 2, 2001, in Charlotte, North Carolina, MURPHY received an email from Zwerner with an attached spreadsheet containing financial results that Zwerner said could be forwarded to Murphy's superiors because Zwerner had deleted the sheet containing the false marketing profits;

(e)     On numerous occasions, MURPHY and his co-conspirators

25

overstated the marketing profits on transactions, including the following:

   (1) On or about September 1, 1999, Murphy and his co-conspirators caused the entry of a false marketing profit of zero on the trade ticket for a trade with Morgan Guarantee, when, in fact, the trade lost $70,000; and

   (2) On or about October 8, 1999, Murphy and his co-conspirators caused the entry of a false marketing profit of zero on the trade ticket for a trade with National Westminster Bank, when, in fact, the trade lost $75,000.

   (f) With respect to the trade tickets related to an investment agreement contract for the Alameda Corridor Transit Authority, MURPHY and his co-conspirators committed the following overt acts, among others:

   (1) On or about June 19, 2000, Murphy and his co-conspirators caused the entry of a false marketing profit on the trade ticket for the investment agreement; and

   (2) On or about July 24, 2000, Murphy and his co-conspirators caused the entry of a marketing profit on the trade ticket for a hedge transaction when, in fact, the transactions had resulted in a loss;

   (g) With respect to the trade tickets related to an investment agreement for the J. David Gladstones Institutes, MURPHY and his co-conspirators committed the following overt acts, among others:

   (1) On or about October 23, 2001, MURPHY and his co-

conspirators agreed to pay to CDR a $70,000 kickback; and

(2)     On or about January 18, 2002, MURPHY and his co-conspirators caused Financial Institution A to pay a $70,000 kickback to CDR, which payment was disguised on a trade ticket as a fee in connection with a swap which was unrelated to the investment agreement for the J. David Gladstone Institutes.

(IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 371.)

Dated: 07/19/2012

A True Bill

---

SCOTT D. HAMMOND
Deputy Assistant Attorney General

---

ANNE M. TOMPKINS
United States Attorney
Western District of North Carolina

DEIRDRE A. McEVOY
Chief, New York Field Office

PAUL L. BINDER
BRIAN J. STACK
RICHARD A. POWERS
ELIZABETH PREWITT
Trial Attorneys
U.S. Department of Justice

27